IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES E. SMAGALA, an
individual, and LINDA M.
FERRO, an individual,
Co-Trustees of THE
SMAGALA-FERRO 2001 FAMILY
TRUST DATED MARCH 13, 2001,

       Plaintiffs,

v.

SEQUOIA INSURANCE COMPANY, a
California insurance business
corporation, and AMERICAN
FAMILY MUTUAL INSURANCE
COMPANY, a Wisconsin
insurance business
corporation,

       Defendants.

3:12-CV-00860-BR

OPINION AND ORDER

CHRISTOPHER GRADY
KEVIN AMBROSE EIKE
Aldrich Eike, P.C.
319 S.W. Washington Street
Suite 1200
Portland, OR 97204
(503) 226-7045

      Attorneys for Plaintiff

1 - OPINION AND ORDER

**RALPH C. SPOONER**
**TYLER E. STAGGS**
Spooner & Much, PC
530 Center Street
Suite 722
Salem, OR 97301
(503) 378-7777

       Attorneys for Defendant Sequoia Insurance Company

**JAMES L. HILLER**
Hitt Hiller & Monfils, LLP
411 S.W. Second Avenue
Suite 400
Portland, OR 97204
(503) 228-8870

       Attorneys for Defendant American Family Mutual
       Insurance Company

**BROWN, Judge.**

    This matter comes before the Court on Defendant Sequoia Insurance Company's Motion (#12) for Summary Judgment.  For the reasons that follow, the Court **GRANTS** Defendant's Motion and **DISMISSES** Plaintiffs' claims against Sequoia.

## BACKGROUND

    The following facts are taken from the Joint Statement of Agreed Facts and the parties summary-judgment materials.

    The Westbrook Apartments were built in the 1970s and are located in Beaverton, Oregon.  Westbrook is comprised of four buildings containing 48 individual apartment units, a leasing office, storage, parking buildings, and common areas.

In 2007 and 2008 SKL Properties, LLC, and Premium Rental Properties LLC (PRP), acting as developers and general contractors, performed renovations and repairs at Westbrook to prepare the property for sale.

On May 29, 2008, Plaintiffs entered into a contract to purchase Westbrook on completion of the property improvements being undertaken by SKL and PRP.[1] While the improvements were being made, Plaintiffs entered into a lease with SKL for the property.

On August 26, 2008, Defendant Sequoia Insurance Company issued a Commercial Multi-Peril Insurance Policy to Plaintiff Smagala-Ferro 2001 Family Trust covering Westbrook effective August 15, 2008, through August 15, 2009.

In November or December 2008 SKL and PRP represented to Plaintiffs that the improvements and repairs to Westbrook were complete. At that time Plaintiffs terminated their lease with SKL and PRP and took possession of the property.

On July 27, 2009, Sequoia issued a Commercial Multi-Peril Insurance Policy to Smagala-Ferro 2001 Family Trust covering Westbrook effective August 15, 2009, through August 15, 2010.

In June 2011 Plaintiffs hired Western Architectural (WA) as

---

[1] In their Complaint, Plaintiffs allege "Plaintiffs James E. Smagala and Linda M. Ferro, Co-Trustees of the Smagala-Ferro 2001 Family Trust dated March 13, 2001 (Smagala) are the current owners of Westbrook." Compl. at ¶ 4.

forensic architects and engineers to perform an invasive investigation of Westbrook to determine whether there were defects in the Westbrook buildings.

On July 1, 2011, WA issued an Invasive Building Envelope Assessment Report in which it described a number of issues with the buildings, construction, and repairs at Westbrook.

On September 26, 2011, Plaintiffs submitted a Notice of Claim/Proof of Loss to Sequoia in which they advised Sequoia in pertinent part:

> There have been covered losses at the premises that have been discovered thus far, including coverage for property damage and collapse. Smagala hired Western Architectural to perform an invasive exterior envelope assessment of the Westbrook Apartments. The investigation performed by Western Architectural identified property damage and collapse conditions. Enclosed please find a copy of the Western Architectural report dated July 1, 2011.
>
> To help resolve this claim, we ask that Sequoia Insurance Company:
>
> 1.  Immediately investigate the claim with Westbrook Apartments' expert, Western Architectural, and share in the cost of the investigation (e.g., contractors for destructive investigation, scaffolding, equipment, etc); and
>
> 2.  Work with Westbrook Apartments and its expert to determine covered and uncovered loss promptly.

Decl. of Lola Hogan, Ex. 1 at 1-2.

Sequoia hired West Coast Forensics, Engineering and Design, LLC, to investigate the alleged defects at Westbrook.

4 - OPINION AND ORDER

On November 2, 2011, Structural Engineer Jeffrey Lewis of West Coast performed an on-site investigation at Westbrook. Lewis testifies in his Declaration that although the WA report referenced "potential collapse conditions, . . . [the WA report] does not provide any documentation whatsoever of any collapse of any of the buildings at the Westbrook Apartments as of the date of the report."  Decl. of Jeffrey Lewis at ¶ 3.  During the investigation and inspection Lewis "looked for any evidence of collapse.  None of the buildings had collapsed as of the date of [his] investigation.  There was no evidence that any part of any of the buildings had abruptly fallen down or caved in."  Lewis Decl. at ¶ 5.  Lewis testifies "[a]t the time of this investigation, all of the units at the Westbrook Apartment complex were occupied with the exception of one or two units that were being cleaned and prepared for new tenants."  *Id.* at ¶ 4.

On November 23, 2011, Plaintiffs filed an action in Washington County Circuit Court against SKL, PRP, and others alleging misrepresentation, breach of contract, and negligence related to the repairs, renovations, and sale of Westbrook. Specifically, Plaintiffs alleged, among other things, that the defects caused water intrusion and property damage that included causing "portions of the apartments to collapse and . . . imminent risk of additional movement and collapse of building components, all of which continue to threaten the integrity and

livability at the Westbrook apartments."  Decl. of Ralph Spooner,
Ex. 1 at ¶ 15.

On December 22, 2011, Sequoia issued a denial letter to
Plaintiffs in which Vice President of Claims, Lola Hogan, noted
Sequoia had reviewed Plaintiffs' Notice of Claim and WA's report,
had retained its own consultant to inspect and to review the
property, and had reviewed the "emergency repairs" performed at
the property on December 12, 2011.  Hogan also noted:

> The Sequoia policies include various Additional
> Coverages, including the Additional Coverage of
> Collapse.  The Sequoia policies define the term
> "collapse" and the additional coverage of collapse
> to mean as follows:
>
> 1.   With respect to buildings:
>
>> a.   Collapse means an abrupt falling
>> down or caving in of a building or any
>> part of a building with the result that
>> the building or part of the building
>> cannot be occupied for its intended
>> purpose;
>>
>> b.   A building or any part of a
>> building that is in danger of falling
>> down or caving is not considered to be
>> in a state of collapse;
>>
>> c.   A part of a building that is
>> standing is not considered to be in a
>> state of collapse even if it is
>> separated from another part of the
>> building;
>>
>> d.   A building that is standing or any
>> part of the building that is standing
>> that is not considered to be in a state
>> of collapse even if it shows evidence of
>> cracking, bulging, sagging, bending,

leaning, settling, shrinking or
expansion.

The Western Architectural Report was issued on
July 1, 2011.  None of the units within any of the
buildings have at this point been vacated because
of a potential of collapse.  The inspection of the
property did not reveal any building or any part
of any building that had been the subject of an
abrupt falling down or falling in.  None of the
buildings had sustained a collapse which had
caused that building or any part of the building
not to be occupied for its intended purpose.

The December 2, 2011 report from Jeffery Lewis
advises of his analysis on the issue of collapse.
As indicated by Mr. Lewis in his letter:

> "After reviewing the policy definition of
> collapse (attached) I have determined that no
> area at the complex had collapsed at the time
> of my investigation.  Please note also that
> the Western Architectural report only
> references potential collapse conditions and
> provides no documentation whatsoever of any
> collapse."

Sequoia's investigation into this claim, including
having the property inspected by a qualified
structural engineer, has determined that the West
Brook Apartments is not the subject of a collapse
as that term is defined in the Sequoia policies.
Under the circumstances of this claim, there is no
Application of the additional Coverage of
Collapse.

Hogan Decl., Ex. 2 at 11-12.  Ultimately Sequoia denied

Plaintiffs' claim "[b]ased on the information provided to

Sequoia, as well as the request for additional information

requested on October 26, 2011, Sequoia's inspection of the

property and its reliance on the observations and conclusions of

Mr. Lewis and West Coast Forensics."  *Id.* at 12.

7 - OPINION AND ORDER

Hogan, however, advised Plaintiffs:

> [I]f either you or your clients are aware of any
> facts which in your opinions is relevant to the
> coverage afforded under the Sequoia policies, we
> welcome those thoughts and will give serious
> consideration to any information provided. Should
> any information whatsoever be developed which
> bears in any way upon Sequoia's coverage in this
> matter, please bring it to our attention
> immediately.

*Id.* at 12-13.

Plaintiffs did not provide Sequoia with any further information related to their claim.

On May 15, 2012, Plaintiffs filed a Complaint in this Court against Sequoia and American Family Mutual Insurance Company alleging, among other things, that Sequoia breached its insurance-policy contracts with Plaintiffs when they denied Plaintiffs' September 2011 claim.

On August 28, 2012, Sequoia filed a Motion for Summary Judgment on the grounds that

(1)    Plaintiffs's claim is barred by the two-year
       contractual limitations provision because Plaintiffs
       filed this action on May 15, 2012, and the facts
       alleged in the Complaint and in the record establish
       the "hidden decay" that caused the damage was
       discovered and not repaired during SKL and PRP's
       renovations and repairs conducted in 2007 and 2008;
       therefore, all damages occurred well before the May 15,

8 - OPINION AND ORDER

2010, contractual two-year limitations date; and

(2)    Plaintiffs' alleged losses did not occur within the
policy period because Plaintiffs fail to point to any
alleged collapse from hidden decay that "commenced"
during the policy period of August 15, 2008 to
August 15, 2010; and, in fact, Plaintiffs' expert
stated in his July 2011 report only that there was a
"potential collapse condition" not that any part of the
premises had collapsed and the record establishes the
apartments were occupied as late as November 2, 2011;
and

(3)    There has not been any "collapse" at the property
within the meaning of the policy.

On November 15, 2012, Plaintiffs filed their Response to
Sequoia's Motion in which Plaintiffs clarified that they seek
coverage from Sequoia only for the alleged collapses in units 11
and 21 and only under the Additional Coverage Collapse section of
the Sequoia policies.  Plaintiffs allege the ceilings in units 11
and 21[2] "abruptly caved in on December 16, 2009 and January 1,
2010 respectively."  According to Plaintiffs, therefore,
collapses occurred within two years of "the tolling of

---

[2] Theresa Peterson states in her Declaration that the
ceilings in units 46 and 10 also suffered "cave in[s]" in 2011.
Plaintiffs, however, advised the Court at oral argument that they
do not rely on those events as a basis for their claim against
Sequoia.

9 - OPINION AND ORDER

Plaintiffs' claims on November 15, 2011" and during the policy period.

Sequoia asserts in its Reply that in addition to its earlier bases for summary judgment, Plaintiffs do not have any coverage under Sequoia's policies because Plaintiffs failed to promptly notify Sequoia of the alleged collapses in units 11 and 21. Specifically, Sequoia points out that although Plaintiffs allege in their Response that the collapses occurred in December 2009 and January 2010, Plaintiffs did not allege the collapse of any particular units in their September 26, 2011, Notice of Claim letter nor are the alleged collapses noted in WA's July 2011 report on which Plaintiffs relied in their Notice of Claim and which merely noted "possible collapse conditions" rather than an actual collapse. In addition, Sequoia specifically relied on the lack of collapse in its December 2011 denial letter, and Plaintiffs never provided evidence or further information to Sequoia about the alleged collapses in units 11 and 21.

Sequoia pointed out in its Reply that Peterson testifies in her Declaration that she knew about the alleged collapses at the time they occurred, but Plaintiffs did not bring this information to Sequoia's attention until Plaintiffs filed a Response to Sequoia's Motion for Summary Judgment.

On December 14, 2012, the Court held a conference to address Sequoia's assertion that Plaintiffs relied on new evidence in

support of their claim and that Plaintiffs, therefore, had failed to give timely notice to Sequoia.  At the hearing the Court stayed Sequoia's Motion to allow the parties to conduct additional discovery.

On February 15, 2013, the parties filed a Joint Statement of Agreed Facts related to Sequoia's Motion for Summary Judgment.

On February 26, 2013, the Court held another conference and directed the parties to file supplemental briefing on Sequoia's Motion for Summary Judgment.

On May 13, 2013, after additional discovery, Plaintiffs filed their Sur-Response to Sequoia's Motion in which Plaintiffs concede they did not inform Sequoia of the alleged collapses in units 11 and 21 until they filed their Response to Sequoia's Motion.  Plaintiffs, however, assert Sequoia has not established any prejudice arose from Plaintiffs' failure to advise Sequoia of the collapses for more than two years, and, therefore, Sequoia is not entitled to summary judgment.

On May 20, 2013, Sequoia filed a Supplemental Reply in support of its Motion in which it continues to assert the failure of timely claims notice as a basis for summary judgment.

On June 7, 2013, the Court heard oral argument on Sequoia's Motion and Sequoia advised the Court that it no longer asserted Plaintiffs' claim is barred by the two-year, contractual-limitations provision.  Sequoia advised the Court that, based on

additional discovery, it relies instead on its assertion that
Plaintiffs have failed to establish there was any collapse in
units 11 or 21 during the policy period and that Plaintiffs
failed to give timely notice of the alleged collapses as bases
for its Motion for Summary Judgment.

## STANDARDS

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." *Washington Mut. Ins. v. United
States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  *See also* Fed. R.
Civ. P. 56(a).  The moving party must show the absence of a
dispute as to a material fact.  *Rivera v. Philip Morris, Inc.*,
395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly
supported motion for summary judgment, the nonmoving party must
go beyond the pleadings and show there is a genuine dispute as to
a material fact for trial.  *Id.*  "This burden is not a light one.
. . .  The non-moving party must do more than show there is some
'metaphysical doubt' as to the material facts at issue."  *In re
Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)
(citation omitted).

A dispute as to a material fact is genuine "if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all
reasonable inferences in favor of the nonmoving party. *Sluimer
v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary
judgment cannot be granted where contrary inferences may be drawn
from the evidence as to material issues." *Easter v. Am. W. Fin.*,
381 F.3d 948, 957 (9th Cir. 2004)(citation omitted). A "mere
disagreement or bald assertion" that a genuine dispute as to a
material fact exists "will not preclude the grant of summary
judgment." *Deering v. Lassen Cmty. Coll. Dist.*, No. 2:07-CV-
1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011)
(citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.
1989)). When the nonmoving party's claims are factually
implausible, that party must "come forward with more persuasive
evidence than otherwise would be necessary." *LVRC Holdings LLC
v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

     The substantive law governing a claim or a defense
determines whether a fact is material. *Miller v. Glenn Miller
Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the
resolution of a factual dispute would not affect the outcome of
the claim, the court may grant summary judgment. *Id.*


                         **DISCUSSION**

     As noted, Sequoia advised the Court at oral argument that it

13 - OPINION AND ORDER

asserts two grounds for summary judgment:  (1) Plaintiffs failed

to establish a genuine dispute of material fact exists as to a

collapse in unit 11 and/or 21 during the policy period and

(2) Plaintiffs' notice to Sequoia about the alleged collapse was

untimely.

## I.   Policy language

As noted, the Additional Coverage of Collapse section of

Sequoia's policies defines a collapse as follows:

1.   With respect to buildings:

a.   Collapse means an abrupt falling down or caving in
of a building or any part of a building with the result
that the building or part of the building cannot be
occupied for its intended purpose;

b.   A building or any part of a building that is in
danger of falling down or caving is not considered to
be in a state of collapse;

c.   A part of a building that is standing is not
considered to be in a state of collapse even if it is
separated from another part of the building;

d.   A building that is standing or any part of the
building that is standing that is not considered to be
in a state of collapse even if it shows evidence of
cracking, bulging, sagging, bending, leaning, settling,
shrinking or expansion.

Plaintiffs contend the phrase "abrupt falling down or caving

in" is ambiguous and urge the Court to adopt the interpretation

of that phrase set out in *Malbco Holdings, LLC v. AMCO Insurance

Company*, 629 F. Supp. 2d 1185 (D. Or. 2009).  In *Malbo* the

insurance policy provision for collapse coverage defined collapse

as, among other things "an abrupt falling down or caving in of a

14 – OPINION AND ORDER

building or any part of a building with the result that the
building or part of a building cannot be occupied for its
intended purpose." *Id.* at 1193. The court found that policy
provision was ambiguous, and it ultimately interpreted the
provision as follows:

> [T]he occupancy restriction stands as a proxy for
> a substantial impairment of integrity by adding a
> life and/or safety element to the definition. If
> parts of a building abruptly fall or cave in to
> any degree such that they cannot be occupied for
> their intended purposes . . . then a collapse has
> occurred.

*Id.* at 1196.

Here Sequoia asserts the phrase "abrupt falling down or
caving in" is not ambiguous. To establish that a collapse
occurred, Sequoia contends a policyholder must show both that a
building or any part of a building (1) suffered an abrupt falling
down or caving in and (2) the building or a part thereof cannot
be occupied as a result. Sequoia asserts the mere danger of
falling down or caving in is insufficient to trigger coverage,
and a falling down or caving in that does not render at least
part of a building unoccupiable is also insufficient. Finally,
even if the Court adopts Plaintiffs' proposed definition, Sequoia
maintains Plaintiffs have not produced evidence sufficient to
establish any abrupt cave-in occurred to a degree that rendered
units 11 and 21 uninhabitable or usable for their intended
purpose.

15 - OPINION AND ORDER

## II.  Collapse

Plaintiffs rely on the Declarations of Theresa Peterson,
Eric Hoff, and James Smagala to support their assertion that
there were collapses in units 11 and 21 during the policy period.
Defendant, however, contends those Declarations do not establish
any genuine dispute of material fact that a collapse occurred.

### A.   Peterson Declaration

Peterson testifies in her Declaration that she became a
resident of Westbrook in March 2008 and has lived there since
that time "with the exception of approximately a five-month
period," the timing of which was neither set out in her
Declaration nor identified at oral argument.  Decl. of Theresa
Peterson at ¶ 3.  Peterson testifies she became the property
manager at Westbrook in June 2010, which was several months after
the second alleged cave-in occurred.  *Id.* at ¶ 2.

Peterson testifies:

> In my experience as property manager, I have
> received all maintenance requests, repair
> requests, and emergency repair requests at
> Westbrook.  I received these types of requests at
> times on a daily basis and at other times on a
> weekly basis.  As property manager, I have
> reviewed all maintenance and repair documentation
> for Westbrook on file, including all documents for
> the time period from 2008 until the present.  I am
> very familiar with the maintenance and repair
> history of Westbrook from 2008 until the present.

*Id.* at 5.

As to the alleged collapses, Peterson testifies in

16 – OPINION AND ORDER

pertinent part:

> Based upon my personal observations and
> investigations *as property manager*, many apartment
> units at Westbrook experienced a sudden and abrupt
> movement of several inches downward at ceilings
> and away from roof joists above.  In other words,
> each of the ceilings experienced a cave in.  The
> apartment units that have experienced a cave in
> include but are not limited to:  (1) unit 11, top
> floor of Building 1 on December 16, 2009; (2) unit
> 21, top floor of Building 2 on January 1, 2010 and
> November 2010.

*Id.* at ¶ 6 (emphasis added).

As Sequoia points out, however, Peterson's Declaration
does not establish how Peterson would have had any personal
knowledge that the alleged cave-ins were abrupt.  Specifically,
Peterson testifies she did not become the property manager until
June 2010, which is five to six months after the alleged cave-ins
in units 11 and 21.  Moreover, Peterson does not explain how she
would have personal knowledge of abrupt collapses in the units
when she was merely a resident of Westbrook.  In addition, as
noted, Peterson testifies she was not a resident of Westbrook for
a five-month period.  The evidence, however, does not identify
the period when Peterson was not a resident and, therefore,
lacked personal knowledge of events at Westbrook.  Peterson also
does not testify the alleged cave-ins rendered units 11 and 21
unoccupiable or to any degree uninhabitable or unuseable as
rental properties.  In fact, the July 2011 WA Report does not
mention any units being uninhabitable or unoccupied for any

reason.  Finally, Sequoia notes Smagala testified at deposition
that he relied solely on the 2011 WA Report when he submitted
Plaintiffs' claim to Sequoia and did not rely on any information
from Peterson.

    **B.    Hoff Declaration**

         Plaintiffs also rely on the Declaration of Eric Hoff,
senior architect and president of WA, to support their allegation
of collapses.

         Although Hoff did not participate in WA's June 2011
investigation and review of Westbrook, he testifies he reviewed

> photographs of construction defects and property
> damage taken by Western Architectural during its
> many investigations at Westbrook.  I reviewed
> reports by Western Architectural documenting
> construction defects and property damage at
> Westbrook.  I reviewed the declaration of Theresa
> Peterson, property manager for Westbrook, to
> obtain a history of the buildings.

Decl. of Eric Hoff at ¶ 4.

         Hoff testifies with respect to the issue of collapse:

> Based upon my review of photographic document-
> ation, expert reports, maintenance reports, and
> the history of maintenance and repair issues
> documented in the Declaration of Theresa Peterson,
> I conclude that hidden decay caused abrupt
> movement and a cave in of ceilings at Westbrook at
> units . . . 11 [and] 21 . . . at the times noted
> in the Declaration of Theresa Peterson.  At the
> time of each cave in, it was not safe for the
> occupants to inhabit the areas in each unit
> underneath the caved in ceiling.  These areas
> could not be occupied for their intended uses
> while in a state of collapse.

*Id.* at ¶ 5.

18 - OPINION AND ORDER

Hoff, however, does not indicate in his Declaration the way in which the evidence before him establishes the alleged cave-ins occurred in December 2009 and January 2010 as opposed to occurring at some point between the end of the policy period (August 15, 2010) and the time of the inspection (June 2011).

Hoff also does not account for why WA's July 2011 Report did not mention any collapses or ceiling cave-ins in any Westbrook unit, but instead mentioned only "potential collapse conditions" even though the ceilings in units 11 an 21 purportedly caved in well before the June 2011 inspection by WA.

**C.   Smagala Declaration**

James Smagala testifies in his Declaration that he "did not make a collapse claim at the time the ceilings caved in at units 11 and 21 because [he] was not aware that [Sequoia's] policies would cover such events." Decl. of James Smagala at ¶ 7. Smagala testifies he was not "aware of collapse conditions at Westbrook until after [WA] provided [him] with its initial investigation report in July 2011." *Id.*

Nevertheless, Smagala does not provide any explanation as to why he, as one of the owners of Westbrook, was not advised or informed about the alleged cave-ins of units 11 and 21 at the times they occurred, particularly in light of Peterson's testimony that she was aware of the cave- ins in December 2009 and January 2010.

19 - OPINION AND ORDER

Finally, Smagala does not testify units 11 and 21 were
unoccupiable or unfit for their intended purpose after December
2009 and January 2010 as a result of the alleged cave-ins.  In
fact, the evidence establishes these units continued to be
inhabited continuously until at least November 2011, which was
four months after the WA Report.

D.    **Declaration of Jeffrey Lewis**

Sequoia relies on the Declaration of Jeffrey Lewis, the
structural engineer who conducted the onsite investigation of
Westbrook as Sequoia's expert, to support its assertion that
Plaintiffs have not established a genuine dispute of material
fact exists as to the issue of collapse.  Lewis testifies in
pertinent part:

> I have reviewed the Western Architectural report
> dated July 1, 2011 related to the Westbrook
> Apartments.  The report references potential
> collapse conditions, but it does not provide any
> documentation whatsoever of any collapse of any of
> the buildings at the Westbrook Apartments as of
> the date of the report.
>
> I also conducted an on-site investigation of the
> Westbrook Apartments on November 2, 2011.  I
> personally observed all of the buildings during
> this investigation.  At the time of this
> investigation, all of the units at the Westbrook
> Apartment complex were occupied with the exception
> of one or two units that were being cleaned and
> prepared for new tenants.
>
> During my investigation on November 2, 2011, I
> looked for any evidence of collapse.  None of the
> buildings had collapsed as of the date of my
> investigation.  There was no evidence that any

part of any of the buildings had abruptly fallen
down or caved in.

Lewis Decl. at ¶¶ 3-5.

**E.    Summary**

Assuming without deciding that "collapse" should be
defined as Plaintiffs argue, the Court concludes Plaintiffs,
nevertheless, have not provided sufficient evidence from which a
rational trier of fact could find that the ceilings collapsed in
units 11 and 21.  As noted, Plaintiffs rely on the testimony of
Peterson, who was at best merely a tenant in another unit at the
time of the alleged collapse and at worst was not even a resident
at Westbrook at the time of the alleged collapses.  In addition,
the record reflects Plaintiffs' claims notice to Sequoia did not
include any mention of collapses in any units, the WA report did
not mention collapses in any units, West Coast's expert testified
he did not see any collapses or cave-ins during his inspection,
and the units in which the alleged cave-ins occurred continued to
be occupied for years after the alleged collapses purportedly
occurred and for at least four months after WA issued the July
2011 Report.  Although the Court is required to view all evidence
in the light most favorable to Plaintiffs as nonmovants, the
Court may not engage in speculation.

On this record the Court concludes Plaintiffs have not
provided sufficient evidence from which a rational trier of fact
could find without speculation that ceiling collapses occurred in

21 - OPINION AND ORDER

units 11 and 21.  Accordingly, there is not any legitimate jury issue on this question.

## III. Failure to provide timely notice of collapses

Even if Plaintiffs could establish a genuine dispute of material fact exists as to collapses in units 11 and 21, Sequoia also contends Plaintiffs failed to give Sequoia timely notice of the collapses as the policy requires, and, therefore, Plaintiffs are not entitled to coverage.

The Court notes it is undisputed that Plaintiffs did not claim the collapses in units 11 and 21 in their Notice of Claim/Proof of Loss and did not advise Sequoia of the collapses until Plaintiffs filed their Response to Sequoia's Motion for Summary Judgment on November 15, 2012, which was almost three years after the alleged collapses.

### A.   Policy language

With respect to notification for loss or damage, the policies provide in pertinent part:

> E.   Duties in the Event of Loss or Damage
>
> a.   You must see that the following are done in the event of loss or damage to Covered Property:
>
> * * *
>
> (2)   Give us prompt notice of the loss or damage.  Include a description of the property involved.
>
> (3)   As soon as possible, give us a

description of how, when and where
the loss or damage occurred.

**B.    The law**

Oregon courts have held a policyholder bears the burden
to establish conditions affording coverage, including the burden
to show he provided timely notice of damage.  *See Ass'n of Unit
Owners of Nestani v. State Farm Fire & Cas. Co.*, 670 F. Supp. 2d
1159, 1161 (D. Or. 2009), *aff'd sub nom. Ass'n of Unit Owners of
Nestani-A Grecian Villa v. State Farm Fire & Cas. In. Co.*, 434 F.
App'x 579 (9th Cir 2011).  The purpose of requiring the insured
to give the insurer timely notice is to allow the insurer time to
adequately investigate the potential claim and thus to protect
itself and the insured.  *Lusch v. Aetna Cas. & Sur. Co.*, 272 Or.
593, 597 (1975).

Under Oregon law an insurer may deny coverage on the
basis of an insured's failure to give timely notice of the claim
if the insurer satisfies a two-part inquiry regarding prejudice
and reasonableness.  *Gerke v. Travelers Cas. Ins. Co. of Am.*, 815
F. Supp. 2d 1190, 1201 (D. Or. 2011).  The first inquiry is
whether the insurer was prejudiced by the insured's conduct.  *Id.*
If the insured establishes prejudice, the second inquiry is
whether the insured acted reasonably.  *Id.*

**C.    Prejudice**

Sequoia contends it was prejudiced by Plaintiffs'

23 - OPINION AND ORDER

failure to provide notice of the alleged collapses for nearly
three years because Sequoia lost the opportunity to investigate
the damage before any repair work was done on the units and lost
the ability to determine the cause of the damage, whether it was
a covered cause of damage, and to pursue any potential
subrogation claims against the responsible party.  Sequoia also
asserts it lost the opportunity to assist in selecting repair
contractors and to review repair bids.

   Plaintiffs contend Sequoia has not shown it was
prejudiced because Sequoia has not submitted "evidence to
demonstrate why its expert could not determine the cause of
collapses at Westbrook" under the existing circumstances.  But
this argument misses the point that it was nearly three years
after the alleged collapses occurred when Plaintiff gave Sequoia
notice, and, by that point in time, it was not possible for
Sequoia to turn back the clock to have its expert examine the
units to determine the alleged cause of the collapses at the time
they occurred.  This is especially true because, in the
intervening years, many factors such as the nature of repairs and
weather would make a reasonably accurate retroactive
determination extremely difficult, if not impossible.  Moreover,
Plaintiffs do not even address Sequoia's assertion of prejudice
based on the fact that by the time Plaintiffs ultimately reported
the alleged collapse, so much time had passed that Sequoia had

24 - OPINION AND ORDER

effectively lost the ability to seek subrogation from any potentially responsible party for the alleged collapse.

The Court concludes this record establishes Sequoia suffered actual prejudice as a result of Plaintiffs' failure to give Sequoia timely notice of the alleged collapses and did not give actual notice until almost three years after they purportedly occurred.

**D.    Reasonableness**

Sequoia also asserts Plaintiffs did not act reasonably when they failed to notify Sequoia of the alleged collapses until November 2012 because Peterson admits in her Declaration that she knew of the alleged collapses in units 11 and 21 at the time they allegedly occurred in December 2009 and January 2010. Sequoia asserts Peterson's knowledge is imputed to Plaintiffs as her employers because she was acting as their agent when she was the building manager. As noted, however, at the time of the collapse Peterson was not the manager of Westbrook and it is unclear whether she was even a resident. Nevertheless, Peterson became the manager of Westbrook in June 2010, and her knowledge of the alleged collapses can be imputed to Plaintiffs at least as of that date, which was still over a year before Plaintiffs' September 2011 Notice of Claim was submitted to Sequoia and over two years before November 2012 when Plaintiffs notified Sequoia of the alleged collapses.

25 - OPINION AND ORDER

Plaintiffs' response that their failure to give notice of the collapse until November 15, 2012, was reasonable because they did not discover the cause of the collapses until after WA conducted its investigation and issued its report in July 2011 is insufficient for two reasons. First, the policies require prompt notice of loss or damage rather than prompt notice after determining the cause of the damage or loss. Second, Plaintiffs still fail to establish why it was reasonable for them to fail to include notice of the alleged collapses in their September 2011 Notice of Claim and why Sequoia was not notified of the alleged collapse until Plaintiffs' filed their Response in November 2012, which was well over one year after Plaintiffs allegedly discovered the purported cause of the collapse.

On this record the Court concludes Sequoia has established it was prejudiced by Plaintiffs' failure to notify it of the alleged collapses until November 15, 2012. The Court also concludes Plaintiffs have not established their failure to notify Sequoia of the collapses until November 15, 2012, was reasonable. Accordingly, the Court grants Sequoia's Motion for Summary Judgment.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendant Sequoia Insurance Company's Motion (#12) for Summary Judgment and

26 - OPINION AND ORDER

**DISMISSES** Plaintiffs' claims against Sequoia.

IT IS SO ORDERED.

DATED this 21st day of August, 2013.


ANNA J. BROWN
United States District Judge

27 - OPINION AND ORDER